UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------x
                              :
ROSA M. MORA,                 :
                              :
            Plaintiff,        :          **MEMORANDUM & ORDER**
                              :          13-CV-2253 (KAM)
                              :
      -against-               :
                              :
COMMISSIONER OF SOCIAL        :
SECURITY                      :
                              :
            Defendant.        :
------------------------------x

**KIYO A. MATSUMOTO, United States District Judge:**

        Pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3),
plaintiff Rosa M. Mora ("plaintiff" or "Ms. Mora") seeks
judicial review of the final decision of Commissioner of
Social Security Carolyn Colvin ("defendant" or
"Commissioner") denying plaintiff's application for
disability insurance benefits under Title II of the Social
Security Act ("the Act") and for Supplemental Security
Income ("SSI") under Title XVI of the Act.  Presently
before the court are defendant's motion for judgment on the
pleadings and plaintiff's cross-motion to vacate the final
administrative decision and to remand this action for
additional administrative proceedings, both made pursuant
to Federal Rule of Civil Procedure 12(c).  For the reasons
set forth below, plaintiff's motion to remand is denied and

defendant's motion for judgment on the pleadings is
granted.

**BACKGROUND**

**I. Procedural History**

On January 17, 2008, plaintiff applied for
disability insurance benefits under Title II, and, on
January 29, 2008, plaintiff applied for SSI benefits under
Title XVI.  (Administrative Transcript ("Tr.") 13.)
Plaintiff alleged disability beginning April 1, 2006 due to
bipolar disorder, epilepsy, back problems, and acid reflux.
(Tr. 174.)  Plaintiff's claim was denied on July 3, 2008
and plaintiff requested an administrative hearing.  (Tr.
66-84, 86-90.)  Plaintiff and her non-attorney
representative from Social Security Advocacy Group, along
with vocational expert Raymond Cestar, appeared before ALJ
Seth Grossman on December 23, 2009.  (*See* Tr. 32-62
(hearing transcript).)  On April 23, 2010, the ALJ issued a
decision concluding that plaintiff was not disabled under
the Act for both disability insurance benefits and for SSI.
(Tr. 10-31.)

On May 3, 2010, plaintiff appealed the ALJ's
decision.  (Tr. 8-9.)  On February 9, 2013, the Appeals
Council denied plaintiff's request review, adopting the
ALJ's April 23, 2010 decision as the final decision of the

2

Commissioner as to plaintiff's January 2008 applications for disability and SSI benefits.  Plaintiff subsequently filed this instant appeal in the District Court for the Eastern District of New York.

On September 30, 2013, Commissioner moved for judgment on the pleadings.  (*See* Mot. for J. on the Pleadings, ECF No. 30.)  Plaintiff filed a cross-motion on December 2, 2013 to remand this action for additional administrative proceedings.  (*See* Cross-Mot. for J. on the Pleadings, ECF No. 32).

## II. Non-Medical Facts in the Administrative Record

Ms. Mora was born on December 3, 1969, and was 36 years of age on the alleged onset date, and 40 years of age at the time of the ALJ's decision.  (Tr. 148.)  She completed a G.E.D. in 1989.  (Tr. 181.)  From approximately 1992 to 2004, Ms. Mora worked as a home attendant and as a daycare center aide.  (Tr. 39, 175.)  Ms. Mora also testified that she worked as a babysitter in 2005.  (Tr. 41.)  Ms. Mora reported that she stopped working in September 2005, because she was "not able to concentrate and [her] mood just changed".  (Tr. 174.)  At the hearing before ALJ Grossman, Ms. Mora also testified that she stopped working because her employer was planning to

relocate and her seizures prevented her from working a full day.  (Tr. 40.)

At the time of her application for benefits, Ms. Mora lived in a women's shelter.  (Tr. 184.)  At her December 2009 hearing, Ms. Mora testified that she lived with her husband and eight month-old son in the East New York neighborhood of Brooklyn, New York.  (*See* Tr. 34-41.) Ms. Mora also testified that her husband typically did the cooking, laundry, and shopping, and she bathed and dressed their son.  (Tr. 42.)  Ms. Mora testified that she typically did not leave her home, because she would "tend to forget where [she was]" and was concerned about epileptic seizures.  (Tr. 42-43.)

Ms. Mora testified that she previously had a drug problem, but that she last used illegal drugs in 2005. (Tr. 51.)  Ms. Moral testified that she successfully completed a methadone program.  (*Id*.)  Ms. Mora also testified that the last time she used alcohol was in 2006. (Tr. 52.)

III. **Plaintiff's Medical History**

  A. **Prior to the Alleged Onset Date of April 1, 2006**

On December 27, 2000, S. Marshall, M.D., of HS Systems, Inc. ("HSS"), conducted an internal medicine

4

consultative examination of the plaintiff.  (Tr. 337-49.)
Ms. Mora complained of migraine headaches with acute loss
of vision and photophobia.  (Tr. 337-344.)  Following a
physical examination of the plaintiff, Dr. Marshall
diagnosed her with "migraines with opthalmological
complications" and mild anemia.  (Tr. 338.)  Ms. Mora was
referred to neurological and primary care follow-up, and
she was prescribed Relafen and Ultram for pain.  (Tr. 338-
43.)

In March 2001, Ms. Mora underwent gastric bypass
surgery at St. Luke's-Roosevelt's Hospital Center ("St.
Luke's").  (*See* Tr. 331.)

On May 15, 2001, Won Cho, M.D., of HSS, conducted
an internal medicine consultative examination.  (Tr. 323-
30.)  Ms. Mora related that she had undergone gastric
bypass surgery, had a history of migraine headaches, and
had no history of mental illness.  (Tr. 323.)  Dr. Cho
diagnosed the plaintiff with morbid obesity that was
improving subsequent to the gastric bypass surgery,
moderate migraine headaches, anemia, and mild leukoprenia.
(Tr. 323-24.)  Dr. Cho assessed that Ms. Mora was able to
sit, stand, travel, handle objects, hear, and speak, but
noted that she was moderately impaired for walking,

lifting, and carrying due to her obesity and migraines. (Tr. 324.)

On August 1, 2003, O. Aron, M.D., of HSS, conducted an internal medicine consultative evaluation. (Tr. 353-66, 371-84.)  Ms. Mora related that she was suffering from abdominal pain, depression, and dizziness. (Tr. 359-60.)  Ms. Mora reported that she was hospitalized in May and July of 2013 for acute gastroenteritis and dehydration.  (Tr. 359.)  Ms. Mora also reported that she had a history of depression since 2000 but denied suicidal ideation and hallucinations.  (*Id.*)  Ms. Mora stated that she was not being treated by a psychiatrist.  (*Id.*)  On examination, Dr. Aron found plaintiff's behavior and affect to be normal, her joints demonstrated full range of motion, her spine demonstrated full range of motion, her straight leg raising was bilaterally negative, and her station and gait to be normal.  (Tr. 360.)  Dr. Aron diagnosed Ms. Mora with depression, dizziness, history of gastric bypass surgery, and obesity with abdominal discomfort and moderate limitation.  (*Id.*)  Plaintiff was moderately impaired in performing activities requiring lifting and carrying, but was capable of light activities.  (*Id.*)  In November 2003, HSS cleared plaintiff to participate in work-related activities.  (Tr. 375.)

On January 26, 2004, plaintiff was examined by Ramakrsshnaya Pattumudi, M.D., of HSS. (Tr. 385-402.) Ms. Mora complained of fatigue, dizziness, and headaches. (Tr. 389.) Ms. Mora reported taking Elavil for depression but was not being treated by a psychiatrist. (*Id.*) She had no difficulty with activities of daily living and she was alert, and oriented to person, place, and time. (Tr. 390.) Her behavior and affect were normal, her station and gait were normal, her joints had full range of motion, and her straight leg raising was negative bilaterally. (*Id.*) Dr. Pattamudi diagnosed status-post gastric surgery with chronic diarrhea, chronic dizziness, anemia, obesity, mild depression, migraine, and alcohol abuse. (*Id.*) Dr. Pattamudi assessed that Ms. Mora was able to perform sedentary activities. (*Id.*)

On March 24, 2004, Samuel Feig, M.D., HSS conducted an internal medicine consultative evaluation. (Tr. 403-410.) Ms. Mora stated that she has suffered from depression and anxiety for three years and has suicidal ideation at times. (Tr. 407.) She also reported that she has been experiencing migraines since age seventeen and that she has migraine headaches lasting two days twice per week. (*Id.*) Ms. Mora reported she was taking Amitriptyline for depression, Imitrex for migraine

headaches, iron tablets for anemia, calcium and vitamin D
supplements, and that she was receiving Vitamin B-12
injections. (*Id.*) Plaintiff's station and gait were
normal, her joints had full range of motion, her spine had
normal range of motion, and her straight leg raising was
negative bilaterally. (Tr. 408.) Plaintiff was alert and
oriented to time, person, and place. (*Id.*) Dr. Feig
diagnosed psychiatric illness, clinically stable post
gastric surgery, vitamin deficiency secondary to gastric
bypass surgery, and alcohol and cocaine abuse by history.
(*Id.*) Plaintiff was capable of sedentary to light
activities, and could sit, stand, walk, handle objects,
hear, speak, and travel. (*Id.*) She was mildly impaired
for lifting and carrying. (*Id.*)

On March 31, 2004, plaintiff was examined by HSS
psychiatrist Bruce E. Rubenstein, M.D. (Tr. 411-12.) Ms.
Mora reported a three year history of depression and
anxiety symptoms and mood instability secondary to drug and
alcohol use. (Tr. 411.) She was enrolled in a daily drug
and alcohol treatment program at Woodhull Medical & Mental
Health Center ("Woodhull"). (*Id.*) Plaintiff related that
she had last used heroin and cocaine two to three weeks
before and was drinking two to three cups of vodka per day.
(*Id.*) Dr. Rubenstein attributed her symptoms to her

substance abuse.  (*Id.*)  Dr. Rubenstein reported that Ms.
Mora made good eye contact, her speech was normal in rate
and volume, her thought content demonstrated mild paranoia
and was negative for hallucinations, delusions, suicidality
or homicidality.  (Tr. 412.)  Dr. Rubenstein also reported
that Ms. Mora's memory and concentration were intact and
that she was alert and oriented as to time, person, and
place.  (*Id.*)  Dr. Rubenstein diagnosed substance induced
mood disorder and cocaine, heroin, and alcohol dependence
on Axis I; and post gastric bypass syndrome, migraines,
vitamin deficiency and mild anemia on Axis III.  (*Id.*)  Dr.
Rubenstein assessed that Ms. Mora was employable but with
psychiatric limitations.  (*Id.*)

From March 3 to July 7, 2004, plaintiff received
outpatient treatment, including individual therapy for
alcohol, cocaine, and heroin addiction at Woodhull.  (Tr.
217-31.)  When plaintiff left treatment in July 2004, her
toxicology results were positive for opiates, cocaine, and
benzopdiazapine.  (Tr. 229-31.)  Plaintiff did not accept
referral for detoxification, stating that she needed to
care for her mother.  (Tr. 229.)

On February 1, 2006, plaintiff had a liver biopsy
which showed minimal lobular and acinar inflammation,
minimal stenosis and no fibrosis.  (Tr. 314-15.)  On

February 8, 2006, an upper GI series revealed a small residual gastric pouch with no leak and tight anastomosis secondary to postoperative edema. (Tr. 312.)

### B. On or After the Alleged Onset Date of April 1, 2006

On August 10, 2006, Ms. Mora was admitted to Wyckoff for right arm weakness and possible cervical radiculopathy. (Tr. 251-52.) A CT scan of the cervical spine revealed no evidence of a herniated cervical disc or spinal stenosis. (Tr. 252.) Against medical advice, plaintiff left Wyckoff two days later. (Tr. 251.)

On May 27, 2007, plaintiff was admitted to Wyckoff for acute abdominal pain and thumb pain secondary to trauma that occurred a week earlier. (Tr. 233-50.) Plaintiff's only medication was Methadone. (Tr. 234.) It was noted that she was in a detoxification program. (*Id.*) On examination, plaintiff's gait and reflexes were normal, she had good coordination, and peripheral pulses were strong bilaterally with no edema. (Tr. 237.) A CT scan revealed an enlarged fatty liver and dilated pancreatic duct, but no obstruction, peritoneal fluid or bowel inflammation. (Tr. 240.) With regard to her thumb, X-rays showed a fracture of the distal phalanx. (Tr. 241.) A splint was applied to the finger. (*Id.*)

On June 28, 2007, plaintiff was seen at St. Luke's orthopedics clinic for a follow-up of her thumb fracture. (Tr. 317.) There was still some swelling and tenderness and plaintiff was instructed to wear a splint for activities. (*Id.*) On July 12, x-rays showed a transverse partially comminuted fracture of the first distal phalanx with minimal displacement. (Tr. 311.) The hand clinic physician concluded that the bones were well aligned and instructed plaintiff to wear a protective splint. (Tr. 316.)

Records from Jamaica Hospital Medical Center ("JHMC") reflect that Ms. Mora was brought to the emergency room on September 1, 2007 after having experienced seizure activity that lasted approximately fifteen minutes. (Tr. 297.) Ms. Mora reported that she did not have a history of prior seizures. (*Id.*) She expressed that she had a long history of migraines, depression, and drug addiction. (Tr. 295.) Plaintiff was diagnosed with new onset seizure disorder and was prescribed Dilantin. (Tr. 304.) On discharge, plaintiff was given a neurology referral and told to continue taking Trazadone and Lexapro (anti-depressants), and continue with methadone therapy. (*Id.*)

On November 8, 2007, Ms. Mora went to the emergency department at St. Luke's due to a seizure. (Tr.

318.)  She had run out of medication.  (*Id.*)  She was given
a prescription of Dilantin and discharged on the same day.
(*Id.*)  On November 12, 2007, Ms. Mora returned to St.
Luke's emergency department, reporting seizure activity.
(Tr. 319.)  A brain CT-scan performed on November 13, 2007
showed no intracranial hemorrhage or mass effect.  (Tr.
310.)

        In December 2007, Ms. Mora visited Lincoln
Medical and Mental Health Center ("Lincoln") several times.
(Tr. 254-75, 507-76.)  On December 6th and 9th, Ms. Mora
went to Lincoln for bilateral earache, sore throat, cough,
fever, and back pain and requested refills of Dilantin,
Invega, Zoloft and Serequel.  (Tr. 262-67.)  On December
13, 2007, plaintiff was treated for an upper respiratory
infection.  (Tr. 258-61.)  Her chest x-rays were normal.
(Tr. 273.)  On examination, the medical provider noted that
Ms. Mora was alert and oriented, her speech was normal,
chest and lungs were clear, heart rate and rhythm were
regular and pulses were good in the extremities.  (Tr.
258.)  On December 20, 2007, Ms. Mora complained of non-
radiating back pain.  (Tr. 254-256.)  Mr. Mora reported a
pain level of "6" on a scale from 1 to 10.  (Tr. 520.)  The
medical provider noted that Ms. Mora was alert and
oriented.  (Tr. 254, 256.)  Ms. Mora's primary diagnosis

was backache.  (Tr. 254.)  On December 28, 2007, plaintiff
visited Lincoln's emergency department and reported feeling
dizzy and nauseous and that her vision was blurry, "like a
seizure is coming on."  (Tr. 523.)  Later that day,
plaintiff met with a social worker. (Tr. 268-69.)  On
December 30, 2007, Ms. Mora reported hearing voices after
missing certain Zoloft doses.  (Tr. 529.)  On the same day
Ms. Mora was referred to a women's shelter.  (Tr. 270.)

On January 3, 2008, Ms. Mora sought to be
admitted at Lincoln for detoxification, as well as
depression, bipolar disorder, epilepsy, back pain,
gastritis, and gastroesophogeal reflux disease ("GERD").
(Tr. 447.)  She reported that she was taking Dilantin,
Zoloft, Invega, Seroquel, Colace, and Percocet.  (*Id*.)  She
was denied admission at Lincoln and was told to return the
next day with her medications.  (*Id*.)  On January 14, 2008
Ms. Mora visited the emergency department at Lincoln for
complaints back pain and pain while urinating.  Tr. 532-35.
Ms. Mora was diagnosed with pruritus of genital organs.
(Tr. 534-35.)

On January 21, 2008, Ms. Mora returned to Lincoln
and reported two days of abdominal pain and diarrhea.  (Tr.
536-39.)  A CT scan of the abdomen and pelvis revealed a

supraumbilical midline ventral mesenteric hernia measuring
5.0 by 1.3 centimeters.  (Tr. 571.)

On January 28, 2008, Ms. Mora had an initial
visit with Jamsheed Abadi, M.D., who diagnosed the
plaintiff with seizure disorder, asthma by history, and
bipolar disorder by history.  (Tr. 276.)  The doctor
indicated that plaintiff had a history of permanent
disability, and recommended she be seen by a psychiatrist
and a neurologist.  (*Id.*)

On February 8, 2008, Ms. Mora visited the Lincoln
emergency room to request medication refills. (Tr. 271-72,
540-43.)  She reported that she was experiencing insomnia
and occasional auditory hallucinations after she ran out of
Seroquel and Zoloft.  (*Id.*)  Ms. Mora also reported chronic
lower back pain.  (Tr. 542-43.)  Ms. Mora was diagnosed
with backache, unspecified.  (*Id.*)

On February 20, 2008, Ms. Mora was evaluated at
the Federation Employment and Guidance Service ("FEGS"), a
nonprofit health and human services organization.  (Tr.
422-40.)  Ms. Mora reported that she was living at a
shelter operated by the Department of Homeless Services.
(Tr. 424.)  Ms. Mora stated that she was compliant with
treatment and medications and denied any current suicidal
or homicidal tendencies, or auditory or visual

hallucinations. (Tr. 427-28.) Ms. Mora reported that she
spends her day attending substance abuse programs, reading,
socializing, and making appointments. (Tr. 429.) She
reported that she was capable of washing dishes and
clothing, sweeping, vacuuming, making the bed, shopping for
groceries, cooking meals, and attending to her personal
grooming. (*Id.*) Ms. Mora reported knitting as one of her
leisure activities. (*Id.*) She stated that she had no
problems with her daily living activities as long as she
was not depressed. (*Id.*) Ms. Mora reported that she had
not used alcohol or drugs for approximately eleven months.
(Tr. 430.) Ms. Mora related she was taking Invega
(antipsychotic) and Seroquel (antidepressant). (Tr. 431.)
Ms. Mora reported no pain at the time of her FEGS
evaluation. (Tr. 434.) Vijaya Reddi, M.D. assessed that
Ms. Mora could not sit, climb or grasp. (Tr. 434-35.) Dr.
Reddi diagnosed a seizure disorder, lower back pain,
bipolar disorder and manic depression, and stated that Ms.
Mora "clearly could not work in her present mental
condition" and needed three months of a wellness day
treatment program before a work determination could be
made. (Tr. 435-36.)

John Clive Spiegel, M.D., of FEGS, conducted a
follow-up appointment with Ms. Mora on March 3, 2008, and

found that Ms. Mora clearly could not work in her present mental condition. (Tr. 437-39.) Dr. Spiegel also suggested three months of a wellness day treatment program before a work determination could be made. (*Id.*)

On March 2, 2008, plaintiff had a follow-up at Montefiore Medical Group ("MM group") with Aaron Fox, M.D. (Tr. 495.) Ms. Mora reported that she had been seen by a psychiatrist and was diagnosed with schizophrenia and a seizure disorder; she was taking Invega, Zoloft, and Seroquel; she was post bariatric surgery and now has an abdominal hernia; and she was anemic. (*Id.*) The physician noted that Ms. Mora had transitioned off methadone and was not using intravenous drugs or other substances. (*Id.*) Dr. Fox, recommended a full physical after blood tests, and refilled the Invega prescription. (*Id.*)

On March 19, 2008, Ms. Mora visited the Lincoln emergency room due to lower back pain. (Tr. 544-47.) Ms. Mora was given Toradol and Flexeril, to which she responded very well and asked to be discharged. (Tr. 547.) Rami Almadi, M.D., diagnosed the plaintiff with backache, unspecified. (*Id.*) Dr. Almadi noted that Ms. Mora became angry when he refused to prescribe Percocet and then declined Tylenol #3 or any other pain medications. (*Id.*)

On March 21, 2008, a treatment plan consisting of
biweekly group psychotherapy sessions was established for
Ms. Mora at the Lincoln psychiatric outpatient department
("psych clinic"). (Tr. 630.) Ms. Mora also visited Dr.
Fox at MM Group on March 21, 2008 for a follow-up
appointment. (Tr. 498.) Ms. Mora reported that she had no
new complaints and that the psychiatrist at Lincoln had
stopped Invega. (*Id.*) Ms. Mora also reported that she was
experiencing discomfort resulting from a post-surgical
hernia. (*Id.*) Dr. Fox noted that Ms. Mora's most recent
seizure occurred in September 2007 and that her seizures
started in 2006 due to heavy alcohol use. (*Id.*) Dr. Fox
advised the plaintiff to avoid pregnancy because she was
taking Dilantin. (*Id.*) Dr. Fox referred Ms. Mora to a
neurologist to change seizure medication and a surgeon to
evaluate her abdominal hernia. (*Id.*)

On April 3, 2008, Alan Dubro, Ph.D., a clinical
psychologist, performed a psychiatric evaluation of
plaintiff at the request of the SSA, at which time Ms. Mora
reported that she was unable to work due to her psychiatric
problems. (Tr. 457-61.) Ms. Mora related that she had
last worked on a full-time basis in 2004, as an English-to-
Spanish translator. (Tr. 457.) Ms. Mora stated that she
lived in a "sober house" and attended an outpatient

17

substance abuse treatment program at Narco Freedom. (*Id.*)
Ms. Mora reported intermittent difficulties falling asleep
and that her appetite was normal. (Tr. 458.) Ms. Mora
reported that she was abusing heroin from the age of 32 for
two years; Dr. Dubro noted that Ms. Mora was using opiate
pain medication on a daily basis. (*Id.*) Ms. Mora reported
that she was able to dress, bathe, and groom herself
regularly. (Tr. 459.) Ms. Mora stated that she regularly
prepared meals for herself, did light cleaning, and was
able to do her own laundry and food shopping. (Tr. 459-
60.) Upon examination, Dr. Dubro found that plaintiff's
thought processes were coherent and goal-directed with no
evidence of delusions, hallucinations, or thought disorder.
(Tr. 459.) Dr. Dubro found that Ms. Mora was oriented to
time, person, and place and her attention and concentration
were intact. (*Id.*) Dr. Dubro found Ms. Mora's mood to be
relatively irritable during the examination, her affect was
mildly constricted in range, and that her cognitive
functioning was estimated to fall in the below-average
range. (*Id.*) Dr. Dubro noted that Ms. Mora's insight was
"poor" and judgment was "fair." (*Id.*)

Dr. Dubro diagnosed dysthymic disorder, opiate
abuse in partial remission, and alcohol dependence in
sustained remission in a controlled environment, and noted

back pain, anemia, and hypercholesterolemia. (Tr. 460.)
Dr. Dubro assessed that Ms. Mora was capable of following,
understanding, and attending to simple directions and
instructions. (*Id.*) Dr. Dubro found Ms. Mora was mildly
impaired, due to irritability, in remembering simple
directions and instructions, but noted that she was able to
perform simple and complex tasks on a regular basis. (*Id.*)
Dr. Dubro also found that Ms. Mora was capable of regularly
being able to attend to a routine and maintain a schedule.
(*Id.*)

On April 3, 2008, Catherine Peleczar-Wissner,
M.D. conducted an internal medicine examination of Ms. Mora
at the request of the SSA. (Tr. 462-73.) Ms. Mora
reported that she had a three-year history of grand mal
seizures and her most recent seizure was in September 2007.
(Tr. 462.) Ms. Mora also reported back pain due to
injuries sustained during her seizures and that an MRI
taken at Woodhull Hospital showed that plaintiff had disc
problems in her back. (*Id.*) Ms. Mora related that she has
had a history of migraines since age 10 and that she
experienced headaches accompanied with nausea three times a
week. (*Id.*) Plaintiff reported that she was taking
Seroquel 300 mg, Oxycodone 5/325 mg, Zetia, Invega, Zoloft,
iron pills, Naprosyn, Tramadol, Imitrex, and Tylenol and

Ibuprofen as needed. (Tr. 463.) Ms. Mora reported that
her prior use of heroin and alcohol stopped in 2003 and
that she was living in a shelter. (*Id.*)

On examination, plaintiff's gait and stance were
normal, squat was full, and she used no assistive devices.
(*Id.*) Her muscle strength was full in upper and lower
extremities. (*Id.*) Plaintiff's deep tendon reflexes were
equal in the upper and lower extremities and no motor
deficits were noted. (*Id.*) Plaintiff's pulmonary function
tests were normal. (Tr. 465.) Dr. Peleczar-Wissner
diagnosed bipolar disease, seizure disorder, history of
migraine headaches, low back pain, narrowing of L4-15 disc
space on x-ray, and asthma. (*Id.*) Dr. Peleczar-Wissner
assessed that plaintiff needed to avoid driving and
operating machinery due to her history of seizures and that
she was moderately restricted for heavy lifting, carrying
and bending due to her history of low back pain. (*Id.*)

On April 4, 2008, Evelyn Vega, LCSW, at the
Lincoln psych clinic, saw plaintiff for a psychotherapy
session. (Tr. 604.) Plaintiff reported that she was
sleeping better because she was taking Seroquel and that
she was struggling to maintain sobriety. (*Id.*) Plaintiff
said she did not have any suicidal ideations or
hallucinations, that she had been sober for six months, and

that she had been on and off methadone for the past year.
(*Id.*)

On April 8, 2008, Stella Belyavsky, M.D. met with
Ms. Mora for medication management.  (Tr. 605.)  Plaintiff
was cooperative, alert, oriented, well-groomed, talkative
and labile.  (*Id.*)  Ms. Mora reported that she did not have
any suicidal ideations or hallucinations.  (*Id.*)  In
response to Ms. Mora's complaint of sleepiness during the
day, Dr. Belyavsky adjusted her Seroquel dosage and added
Zoloft.  (*Id.*)

On April 14, 2008, T. Harding, Ph.D., a
psychologist employed by the New York State Office of
Temporary Disability Assistance, performed a mental
residual functional capacity assessment.  Tr. 474-91.  Dr.
Harding determined that plaintiff's dysthymic disorder and
mixed substance abuse did not satisfy the criteria of
Sections 12.04 (Affective Disorders) and 12.09 (Substance
Addiction Disorders) of the Listing of Impairments in 20
C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 478, 481,
486.)  Regarding the functional limitations resulting from
a claimant's mental disorders (also known as "B criteria"),
Dr. Harding assessed that Ms. Mora was mildly limited in
performing activities of daily living; moderately limited
in social functioning and in maintaining concentration,

21

persistence, or pace; and there was insufficient evidence
to determine if plaintiff had experienced any episodes of
deterioration. (Tr. 488.) The doctor noted that the
evidence did not establish the presence of "C criteria."
(Tr. 489.) Dr. Harding concluded that Ms. Mora's ability
to set realistic goals, make plans independently of others,
and understand, remember and carry out detailed
instructions were moderately limited. (Tr. 474-75.) Dr.
Harding, however, found that Ms. Mora was not limited in
the specific mental activities listed for understanding and
memory, sustained concentration and persistence, social
interaction and adaptation. (*Id.*) Dr. Harding determined
that plaintiff retained the functional capacity for the
basic mental demands of unskilled competitive work. (Tr.
476.)

On April 21, 2008, Ms. Mora visited Dr. Fox at MM
Group for a medical follow up. (Tr. 499.) She reported
having two seizures in the past week despite an "ok"
Dilantin level. (*Id.*) Dr. Fox prescribed Dilantin and
scheduled a neurology consult. (*Id.*)

On May 8, 2008, plaintiff had a seizure while at
the reception area of the Lincoln psych ward and was taken
to the emergency room. (Tr. 548-69.) Sivasubramanian
Narayanan, M.D., the attending physician, noted alcohol on

Ms. Mora's breath, and she stated that she had consumed an entire bottle of alcohol the previous day. (Tr. 550, 556, 566.) Dr. Narayanan conducted a physical examination and found normal motor strength and sensation, and all other indicators were normal. (Tr. 551-52.) The results of the CT scan of Ms. Mora's brain and skull were normal. (Tr. 572.) Dr. Narayanan diagnosed alcohol-related seizure. (Tr. 552.) Initial laboratory results were remarkable for severe anemia, and Ms. Mora was admitted to the hospital for medication and anemia management. (Tr. 553.)

During an examination by Johnny Johnson, M.D., plaintiff denied any chest pain, joint pain, confusion, anxiety, or depression. (Tr. 554.) Dr. Johnson ordered continuation of Dilantin, a neurology evaluation for seizure disorder, transfusion and monitoring for anemia, continuation of Zoloft and Seroquel for bipolar disorder, and planned a referral to a detoxification program. (Tr. 556.) Before she was discharged, Ms. Mora was interviewed by a social worker regarding her substance abuse. (Tr. 563-65.) Ms. Mora refused referral to a substance program, stating that she was on schedule to graduate from Narco Freedom on May 19, 2008. (Tr. 563.) Ms. Mora denied depression or suicidal ideation. (*Id*.) On discharge, Ms. Mora was instructed to slowly return to her usual

activities and was prescribed Ultram, Sertraline, Seroquel, Ferrous SO4, and Colace. (Tr. 567.)

On May 13, 2008, Ms. Mora went to the Lincoln psych clinic to make an appointment. (Tr. 608.) Dr. Belyavsky noted that plaintiff's breath smelled of alcohol but Ms. Mora denied having used alcohol and did not want a referral to an alcohol abuse program. (*Id.*) On May 19, 2008 Dr. Belyavsky again tried to convince Ms. Mora to join a drug treatment program and stated that Ms. Mora appeared cooperative, alert, well-groomed, and talkative. (*Id.*)

On June 19, 2008, plaintiff missed her appointment with Dr. Belyavsky because she was hospitalized for hernia reduction surgery. (Tr. 609.) Dr. Belyavsky's Treatment Plan Update dated June 20, 2008 showed diagnoses of bipolar disorder, alcohol dependence in recent remission, and heroin dependence in remission. (Tr. 631.) The Treatment Update reported a Global Assessment of Functioning ("GAF") of 30-40. (*Id.*)

On June 24, 2008, plaintiff reported to Dr. Belyavsky that she was having a good response to her current medications and denied any psychiatric symptoms or mood swings, but reported having trouble sleeping and occasional pain. (Tr. 609.) Plaintiff was alert, oriented, and well groomed. (*Id.*) Her speech was fluent

and her mood was euthymic.  (*Id.*)  On July 23, 2008, Ms.
Mora reported to Dr. Belyavsky that her common-law-husband
had disappeared and she was moving to a shelter for single
individuals.  (Tr. 610.)  Ms. Mora reported that she was
anxious and stressed, but denied suicidal ideation and
hallucinations.  (Tr. 610-11.)

On September 4, 2008, plaintiff complained to Dr.
Belyavsky of continued anxiety.  (Tr. 613.)  She was
cooperative and alert, and denied suicidal ideation and
hallucinations.  (*Id.*)  A Treatment Plan Update dated
September 19, 2008 by Dr. Berlyavsky reflects diagnoses of
bipolar disorder, alcohol dependence in recent remission,
heroin dependence by history, seizure disorder, back pain,
status post-surgery for abdominal hernia, and a GAF of 30-
40.  (Tr. 632.)

On October 8, 2008, Ms. Mora asked to see Dr.
Belyavsky to discuss her medications because she had
learned that she was ten weeks pregnant.  (Tr. 615.)  Ms.
Mora was calm, cooperative, alert, oriented, and well-
groomed.  (*Id.*)  Her thought and speech were goal directed
and her mood was euthymic.  (*Id.*)  She denied suicidal
ideation and any hallucinations.  (*Id.*)  Dr. Belyavsky
recommended that Ms. Mora switch from Seroquel to Haldol to
control possible auditory hallucinations and mood swings.

(*Id.*)  Dr. Berlyavsky advised Ms. Mora to see her
neurologist regarding her Dilantin dosage.  (*Id.*)

On November 10, 2008, plaintiff reported to Dr.
Belyavsky that the Haldol worked well to control her mood
swings.  (Tr. 616.)  Plaintiff was cooperative, alert,
oriented, calm, and well-groomed.  (*Id.*)  Dr. Belyavsky
renewed plaintiff's Haldol medication.  (*Id.*)

On December 10, 2008, plaintiff saw Jose Matias,
M.D., and reported that she was feeling well.  (Tr. 618.)
Ms. Mora was calm and cooperative and made good eye
contact.  (*Id.*)  Her speech was organized and coherent.
(*Id.*)  Ms. Mora did not report any hallucinations or
delusions.  (*Id.*)  Dr. Matias diagnosed plaintiff with
mixed type bipolar disorder and alcohol and methadone
dependence in remission. (*Id.*)  Dr. Matias assessed that
Ms. Mora was stable and not suicidal or psychotic and
prescribed Haldol.  (*Id.*)

Dr. Belyavsky completed a Treatment Plan Update
dated December 19, 2008 that diagnosed Ms. Mora's with
mixed type bipolar disorder, alcohol dependence in recent
remission, heroin dependence by history, seizure disorder,
back pain, anemia, and status post-surgery for abdominal
hernia.  (Tr. 633.)  Dr. Belyavsky reported a GAF score of

30-40. (*Id.*) The Treatment Plan Update dated March 19, 2009 listed the same diagnoses and GAF score. (Tr. 634.)

On April 22, 2009, plaintiff went to the Lincoln psych clinic to obtain documentation to support her disability benefits application. (Tr. 620.) Dr. Belyavsky and William Ashby, C.W., provided the following documentation: (1) a letter dated April 22, 2009; (2) the "Mental Medical Source Statement Questionnaire" dated April 21, 2009; and (3) the "Report on Substance Abuse" dated April 22, 2009. (Tr. 587-94.) Dr. Belyavsky stated that she saw Ms. Mora monthly for medication and supportive psychotherapy and had prescribed Haldol as a treatment measure. (Tr. 587, 589, 594.) Dr. Belyavsky's diagnoses consisted of mixed type bipolar disorder, alcohol dependence in remission, heroin dependence by history, seizure disorder, back pain, anemia and status post-surgery for abdominal hernia. (*Id.*) Dr. Belyavsky also noted that Ms. Mora was homeless and residing in a women's shelter, and had current and past year GAF scores of 30-40. (Tr. 587, 589, 594.)

Dr. Belyavsky also reported that at her March 10, 2009 session, Ms. Mora appeared adequately dressed and groomed and was cooperative. (Tr. 587, 589.) Dr. Belyavsky reported that Ms. Mora related well, made normal

27

eye contact, demonstrated normal psychomotor skills and gait, and spoke with normal rate and volume. (*Id.*) Plaintiff's attention, concentration, insight, judgment, and impulse were fairly good. (Tr. 587.) Dr. Belyavsky noted that Ms. Mora did not report any suicidal or homicidal ideation. (*Id.*) Dr. Belyavsky reported that Ms. Mora was oriented in time, person, and place and that she was stable with the outpatient treatment and had no acute or distressing side effects from medication. (*Id.*) Dr. Belyavsky indicated on the questionnaire that Ms. Mora was markedly limited in performing activities of daily living; maintaining social functioning; and concentration, persistence, and pace. (Tr. 590.) Dr. Berlyavsky assessed that Ms. Mora was "seriously limited, but not precluded" in the following mental abilities: remembering work-like procedures; understanding and remembering very short and simple instructions; and carrying out very short and simple instructions. (Tr. 591.) Dr. Berlyavsky assessed that Ms. Mora was "unable to meet competitive standards" in the following mental abilities: maintaining attention and concentration for two hour segments; maintaining attendance and being punctual within customary tolerances; sustaining ordinary routine without special supervision, in working with or in proximity with others without being unduly

distracted; completing a normal workday and workweek without interruptions from psychologically based symptoms; performing at a consistent pace without an unreasonable number and length of rest periods; accepting instructions and responding appropriately to criticism from supervisors; getting along with co-workers or peers without unduly distracting them or exhibiting behavior extremes; responding appropriately to changes in a routine work setting; and dealing with normal work stress. (*Id*.) In the Report of Substance Abuse, Dr. Belyavsky indicated that there was no ongoing alcohol or substance abuse. (Tr. 594.)

Dr. Belyavsky completed a Treatment Plan Update dated June 19, 2009 that diagnosed Ms. Mora with mixed type bipolar disorder, alcohol dependence in recent remission, heroin dependence by history, seizure disorder, back pain, anemia, status post-surgery for abdominal hernia, and listed a current GAF score of 30-40. (Tr. 635.) Ms. Mora's September 18, 2009 Treatment Plan Update had the same diagnoses. (Tr. 636.)

On August 13, 2009, Ms. Mora saw Luke N. Aneke, M.D., at American Medical Centers (AMC) because she was out of medication and was experiencing headaches. (Tr. 648.) Dr. Aneke diagnosed GERD, asthma, and headaches, and

prescribed Nexium, Singulair, Tylenol, and Zyprexa. (Tr. 648-49, 639. On August 31, 2009, Ms. Rosa returned to AMC and Henry Claude Gaspard, M.D. prescribed Dilantin, along with refilling plaintiff's prescription of Nexium, Singulair, and Zyprexa. (Tr. 640, 662.)

On September 17, 2009, Ms. Mora reported to Dr. Aneke that she was not sleeping and was anxious. (Tr. 645.) On examination, Dr. Aneke noted that Ms. Mora exhibited no distress, no wheezing, and air entry was good. (*Id*.) Dr. Aneke prescribed Zyprexa for depression and anxiety, and Advair for asthma. (*Id*.) On September 21, 2009, Ms. Mora was examined by Dr. Gaspard for chest pain resulting from a fall in the bathtub two weeks earlier. (Tr. 643.) On examination, Dr. Gaspard found no bruising or deformity of the chest, but did find some tenderness over several ribs and the armpit. (*Id*.) Dr. Gaspard diagnosed possible right chest contusion and ruled out rib fractures. (*Id*.) He ordered x-rays and prescribed Percocet. (*Id*.)

On September 30, 2009, Dr. Belyavsky completed a City of New York Human Resources Administration form requesting assistance in caring for Ms. Mora's newborn child due to her mental condition. (Tr. 657-58.) Dr. Belyavsky indicated that Ms. Mora could ambulate inside and

outside the house, get up from bed and from a seated position, go to the toilet, dress, wash, bathe, and feed herself, but she needed assistance preparing meals. (Tr. 658.)

On November 13, 2009, Ms. Mora was evaluated at FEGS. (Tr. 681-98.) Ms. Mora was living in a shelter and had been in the "shelter system" for over two years. (Tr. 684-85.) Ms. Moa reported that she completed the Narco Freedom program in 2006 and has been sober and clean for over three years. (Tr. 687.) Ms. Mora reported that she was bothered by the following problems "nearly everyday": feeling down, depressed, or hopeless; having little interest or pleasure in doing things; having trouble falling or staying asleep or sleeping too much; feeling tired or having little energy; having poor appetite or overeating; feeling badly about herself or that she was a failure or has let herself or her family down; and having trouble concentrating on things, such as reading the newspaper or watching television. (Tr. 683.) Ms. Mora reported that on "several days" she had thoughts that she would be better off dead or hurting herself in some way. (*Id.*) Ms. Mora also reported that she was able to wash dishes and clothing, sweep, vacuum, make beds, shop for groceries, cook meals, read, socialize, and perform

personal grooming.  (Tr. 688.)  Ian Prescott, the intake
doctor, noted that Ms. Mora's depression, bipolar disorder,
asthma and seizure conditions were stable.  (Tr. 690.)
Jacqueline McGibbon, M.D., diagnosed schizoaffective
disorder, mood stabilizer, right rib fracture, asthma,
seizure disorder, and anemia.  (Tr. 697.)  Dr. McGibbon
assessed that Ms. Mora continued to display symptoms that
interfere with her ability to work and noted that her work
history is sparse with examples of poor work experience as
well as poor ability to interact with the public and
coworkers.  (*Id.*)  Dr. McGibbon recommended that Ms. Mora
continue treatment with her current psychiatrist.  (*Id.*)

On February 8, 2010, Michelle Bornstein, Psy. D.,
performed a consultative psychiatric evaluation.  (Tr. 702-
07.)  Ms. Mora was living with her husband and nine-month
old baby at the time of the evaluation.  (Tr. 702.)  Ms.
Mora stated that she her current medications were Seroquel,
Labetolol, Sertraline, Busparone, and Phenytoin sodium.
(*Id.*)  Ms. Mora reported that she had trouble falling
asleep, that she was irritable and socially withdrawn, and
that she had lost interest in her usual activities.  (*Id.*)
Ms. Mora denied any suicidal ideations, plans or intent,
and there was no evidence or reports of anxiety, panic
attacks or manic episodes.  (Tr. 702-03.)  Ms. Mora

reported that she experienced auditory and visual hallucinations. (Tr. 703.) Ms. Mora reported that she was taken to the hospital, because she was standing in the street unresponsive to those around her. (*Id.*) Dr. Bornstein stated that Ms. Mora did not appear psychotic or disorganized and noted that there were no reports of cognitive deficits. (*Id.*)

Dr. Bornstein performed a mental status examination and found Ms. Mora to be cooperative and her manner of relating, social skills, and overall presentation was adequate. (*Id.*) Dr. Bornstein noted that Ms. Mora was adequately groomed, her motor behavior was normal and her eye contact was appropriate. (*Id.*) Dr. Bornstein found Ms. Mora's speech was fluent and clear and her thought processes were coherent and goal-oriented. (*Id.*) Attention, concentration, and recent and remote memory skills were intact. (Tr. 704.) Dr. Bornstein noted that Ms. Mora was able to dress, bathe, and groom herself. (*Id.*) Ms. Mora reported that she did not cook, but that she cleaned, did laundry, shopped with her husband's assistance, cared for her baby, and attended medical appointments. (*Id.*) Dr. Bornstein diagnosed depressive and psychotic disorders, alcohol abuse in remission, and epilepsy. (Tr. 704-05.) Dr. Bornstein assessed that Ms.

Mora could follow and understand simple directions and perform simple tasks independently. (Tr. 704.) Dr. Bornstein found that Ms. Mora could maintain attention and a regular schedule, and could learn new tasks, but may need supervision performing complex tasks. (*Id.*) Dr. Bornstein also noted that Ms. Mora appeared able to make appropriate decisions, relate adequately with other, and appropriately deal with limited amounts of stress. (*Id.*)

### C. Vocational Expert Evidence

At the December 23, 2009 hearing before ALJ Grossman, vocational expert Raymond Sestar testified that plaintiff's past work as a home attendant, baby sitter, and day care attendant was medium work exertionally and semi-skilled. (Tr. 55.) Mr. Sestar testified that a hypothetical individual with Ms. Mora's age and background who was limited to performing simple, two-step tasks could not perform Ms. Mora's past work, but could perform other jobs. (Tr. 55-56.) Mr. Sestar testified that this hypothetical individual could perform the jobs of cleaner or housekeeper (23,000 jobs in the New York City area and 133,000 jobs nationally), cafeteria attendant (3,700 jobs in the New York City area and 73,000 jobs nationally), and photocopy machine operator (2,000 jobs in the New York City area and 26,000 jobs nationally). (*Id.*) Mr. Sestar

testified that he had obtained the estimated number of jobs from United States Publishing and that they were from the second quarter of 2009.  (Tr. 57.)  Mr. Sestar testified that the jobs he identified were full-time jobs that only required occasional interactions with people.  (Tr. 57-59.)  Mr. Sestar also testified that if the hypothetical individual could not get out of bed once or twice a week, the hypothetical individual could not perform any of the jobs he identified.  (Tr. 56-57.)

**DISCUSSION**

I.  <u>Standard of Review</u>

In reviewing a final decision by the Commissioner under 42 U.S.C. § 405, the court does not determine *de novo* whether a plaintiff is disabled.  *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *Valente v. Sec'y of Health & Human Servs.,* 733 F.2d 1037, 1041 (2d Cir. 1984).  Instead, the reviewing court reviews the administrative transcript to "determine whether the correct legal standards were applied and whether substantial evidence supports the decision." *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004) (citing *Machado v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002).  "Substantial evidence is 'more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Halloran v.*

35

*Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004)(quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). An evaluation of the "substantiality of evidence must also include that which detracts from its weight." *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). The reviewing court, in determining whether findings are supported by substantial evidence, "may not substitute its own judgment for that of the [ALJ], even if it might justifiably have reached a different result upon a *de novo* review" of the records. *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991).

II. <u>Legal Standards for Disability Claims</u>

   A. *The Commissioner's Five-Step Analysis of Disability Claims*

      In order to receive disability benefits, a claimant must become disabled while she still meets the insured status requirements of the Social Security Act and the regulations promulgated by the SSA. *Arone v. Bowen*, 882 F.2d 34, 37-38 (2d Cir. 1989). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

      The Commissioner uses a "five-step sequential

evaluation" to determine whether a claimant is disabled.
20 C.F.R. § 404.1520; *see Perez v. Chater*, 77 F.3d 41, 46
(2d. Cir. 1996)(describing the five-step process).  If the
Commissioner can determine that a claimant is disabled or
not disabled at any step of the five-step sequence, the
evaluation stops at that step and the Commissioner issues
his decision; if a determination cannot be made at steps
one through four, the sequence continues to the fifth step.
20 C.F.R. § 404.1520(a)(4).

 At step one, the Commissioner determines whether
the claimant is currently engaged in substantial gainful
employment.  20 C.F.R. § 404.1520(a)(4)(i).  If the
claimant is engaged in substantial gainful employment, she
is not disabled "regardless of [her] medical condition."
20 C.F.R. § 404.1520(b).  Otherwise, the Commissioner moves
to step two and determines whether the claimant has a
"severe medically determinable physical or mental
impairment."  20 C.F.R. § 404.1520(a)(4)(ii).

 If the claimant's impairment is in fact medically
severe, the sequence continues to step three, in which the
Commissioner compares the claimant's impairment to a
listing of impairments found in 20 C.F.R. Part 404, Subpart
P, Appendix I. § 404.1520(a)(4)(iii). If the claimant's
impairment "meets or equals" one of the listed impairments,

she is *per se* disabled irrespective of her "age, education, and work experience," and the sequential evaluation stops. 20 C.F.R. § 404.1520(d).

If the claimant is not *per se* disabled under step three, the Commissioner must determine the claimant's residual functional capacity ("RFC") before continuing to step four. 20 C.F.R. § 404.1520(e). RFC is defined as the most the claimant can do in a work setting despite the limitations imposed by her impairment. 20 C.F.R. § 404.1545(a)(1). In determining the claimant's RFC, the Commissioner should consider "all of the relevant medical evidence," as well as descriptions and observations by non-medical sources, such as the claimant's friends and family. 20 C.F.R. § 404.1545(a)(3).

After making her RFC determination, the Commissioner will proceed to step four, at which point the Commissioner must determine whether the claimant's RFC is sufficient to perform her "past relevant work," which is defined as substantial gainful activity that the claimant has done within the past fifteen years. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(f), 404.1560(b)(1). If the claimant can perform her past relevant work, she is not disabled. 20 C.F.R. § 404.1520(f). Otherwise, the Commissioner must determine at step five whether the

claimant can make "an adjustment to other work."  20 C.F.R.
§ 404.1520(a)(4)(v).

In making a determination under step five, the
Commissioner must use the ALJ's prior RFC finding in
conjunction with the claimant's "vocational factors" (i.e.,
age, education, and work experience) to determine whether
the claimant can transition to another job that is
prevalent in the national economy.  20 C.F.R. §§
404.1520(g)(1), 404.1560(c)(1).  The Commissioner has a
limited burden under step five to provide "evidence that
demonstrates that other work exists in significant numbers
in the national economy that" the claimant can do in light
of her RFC and vocational factors.  C.F.R. §
404.1560(c)(2).  If the claimant cannot transition to
another job prevalent in the national economy, the
Commissioner must find the claimant disabled.  *See* 20
C.F.R. § 404.1520(g)(1).

B.  *The Treating Physician Rule*

"A treating physician's statement that the claimant
is disabled cannot itself be determinative."  *Green-Younger
v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003)(internal
quotation marks omitted).  Nonetheless, the claimant's
treating physician's opinion regarding the nature and
severity of the claimant's impairment should be given

controlling weight "so long as it is well-supported by medically acceptable . . . diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." *Burgess*, 537 F.3d at 128; *see also* 20 C.F.R. § 404.1527(d)(2). The opinions of treating physicians are afforded more weight because they are more likely to be "able to provide a detailed, longitudinal picture of [a patient's] medical impairment(s) and may bring a unique perspective to the medical findings alone" or from individual examinations. 20 C.F.R. § 404.1527(d)(2).

When the ALJ declines to give controlling weight to the treating physician's opinion in the disability decision, the ALJ must give "good reasons" for the weight assigned to the treating physician's opinion. 20 C.F.R. § 404.1527(b)(2). The ALJ shall consider six regulatory factors in determining how much weight to ultimately assign the treating physician's opinion:

> (1) length of treatment relationship and frequency of examination; (2) nature and extent of the treatment relationship; (3) supportability [i.e., the degree of explanation given in the opinion]; (4) consistency [with the record as a whole]; (5) specialization; (6) other factors such as the treating physician's familiarity with disability programs and with the case record.

20 C.F.R. § 404.1527(d)(2)(i)-(ii); § 404.1527(d)(3)-(6).

III. ALJ Grossman's Decision

On April 23, 2010, ALJ Grossman issued a written decision that Ms. Mora was not disabled under the Act. As an initial matter, the ALJ found that Ms. Mora met the insured status requirements of the Act through December 31, 2010. (Tr. 15.) The ALJ then reviewed plaintiff's record pursuant to the SSA's five-step sequential evaluation analysis for determining whether an individual is disabled. 20 C.F.R. § 404.1520(a). Under step one, ALJ Grossman determined that Ms. Mora had not engaged in significant gainful activity since her alleged onset date of April 1, 2006. (Tr. 15.) ALJ Grossman determined at step two that Ms. Mora had the following severe impairments: bipolar disorder, history of polysubstance abuse and seizure disorder. (*Id.*) ALJ Grossman found that claimant's back pain, migraines and reflux do not constitute "severe" impairments. (Tr. 16.) In step three, ALJ Grossman determined that although Ms. Mora has severe medically determinable impairments, her impairments were not medically equivalent to the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix I, and Ms. Mora was thereby not *per se* disabled.[1] (Tr. 16-18.)

---

[1] ALJ Grossman specifically considered Ms. Mora's medical history in light of listings 11.02 (convulsive epilepsy), 11.03 (non-convulsive epilepsy), 12.04 (affective disorder) and 12.09 (substance addiction

ALJ Grossman found that Ms. Mora's mental
impairment did not meet or medically equal the criteria of
listing 12.04 for affective disorder after evaluating Ms.
Mora's medical history against the "paragraph B" criteria
as required by the Social Security regulations.  (Tr. 16-
18.)  Under subsection 12.04(B), ALJ Grossman considered
Ms. Mora's medical records and hearing testimony regarding
activities of daily living; social functioning;
concentration, persistence, and pace; and episodes of
decompensation and found that plaintiff was mildly to
moderately limited.  (*Id.*)  ALJ Grossman also found that
Ms. Mora's record failed to satisfy the 12.04(C) criteria,
because plaintiff's decompensation was not of the frequency
prescribed by the regulations.  20 C.F.R. Part 404, Subpart
P, App'x 1, Section 12.00.C.4. (Tr. 17-18.)

Before proceeding to step four, ALJ Grossman
determined that Ms. Mora had the RFC to perform a full
range of work at all exertional levels with the following
non-exertional limitations: the plaintiff was able to
perform work limited to simple tasks that required only
limited contact with the public and did not require

disorder).  The court declines to summarize the ALJ's analysis as to
listings 11.02, 11.03 and 12.09, because plaintiff does not make any
arguments challenging the ALJ's determination on the aforementioned
listings and thereby agrees with the ALJ's determination that
plaintiff's impairments did not meet the listings.

exposure to heights or dangerous machinery. (Tr. 18.)
After providing an extensive and comprehensive summary of
Ms. Mora's medical record, ALJ Grossman found that Ms.
Mora's medically determinable impairments could reasonably
cause the alleged symptoms, but that Ms. Mora's testimony
on the intensity, persistence and limiting effects of these
symptoms were not credible to the extent they conflicted
with the evidence in the record and the ALJ's residual
functional capacity assessment. (Tr. 24.) ALJ Grossman
concluded based on Ms. Mora's testimony and medical record
that she can concentrate "fairly well, at least
sufficiently to understand, remember and carry out simple
tasks required for basic mental work activities." (*Id.*)

In his consideration of the opinion evidence, ALJ
Grossman gave little weight to the April 22, 2009 opinion
of Dr. Belyavsky, the plaintiff's treating psychiatrist,
that plaintiff was "seriously limited" in remembering,
understanding and complying with short and simple
instructions, and was unable to meet the competitive
demands of getting along with coworkers or peers. (*Id.*)
ALJ Grossman found that Dr. Belyavsky's April 22, 2009
opinion was not supported by Dr. Belyavsky's own mental
progress notes from Lincoln Hospital which show contrary
findings of largely intact mental abilities and

improvement. (Tr. 25.)  ALJ Grossman specifically noted
that Dr. Belyavsky's opinion was over-restrictive when
compared with the mental status examination findings she
recorded on March 10, 2009, where Ms. Mora was assessed as
having good attention and concentration, good intelligence,
and intact insight and judgment.  (*Id*.)  ALJ Grossman also
found Dr. Belyavsky's opinion to be inconsistent with other
medical opinions in the record, especially those of the
psychiatric consultative examiners and psychological expert
review.  (*Id*.)  ALJ Grossman articulated that he gave
significant weight to the opinions of the psychiatric
consultative examiners and the psychological expert review,
because the opinions are well-supported by specific
examination findings and the clinical notes from Lincoln
Medical and Mental Health Center.  (*Id*.)  ALJ Grossman gave
little weight to the assessment of the FEGS examiners
because "their conclusions are too limiting compared to the
clinical evidence in the record and [are] inconsistent with
other substantial evidence" in the record.  (*Id*.)

        Based on his RFC determinations, ALJ Grossman
determined in step four that plaintiff was unable to
perform her past relevant work.  (Tr. 26.)  At step five,
ALJ Grossman determined that Ms. Mora retained a RFC to
perform alternative substantial gainful work that exists in

the national economy as required by 20 C.F.R. §
404.1520(g). (Tr. 26-27.) ALJ Grossman considered
plaintiff's age, education, work experience, and RFC in
conjunction with the Medical-Vocational Guidelines, 20
C.F.R. Part 404, Subpart P, Appendix 2 and the testimony of
Mr. Sestar, a vocational expert, and determined that jobs
exist in significant numbers in the national economy that
plaintiff can perform. (Tr. 26.)

IV.  Application

        Plaintiff contends that ALJ Grossman improperly
rejected the April 2009 opinion of Dr. Belyavsky, Ms.
Mora's treating psychiatrist, in his decision. (Pl. Mem.
at 20-25.) Plaintiff also notes that Dr. Belyavsky's
assessment is "entirely consistent with the only other
psychiatrist on the record," Dr. Spiegel. (Pl. Mem. at
23.) Consequently, plaintiff argues that the ALJ erred in
steps three and five of the sequential analysis, because
Dr. Belyavsky's April 2009 findings demonstrate that Ms.
Mora meets the diagnostic and severity requirements for
bipolar disorders under 20 C.F.R. Part 404, subpart P,
Appendix I, §12.04 and is unable to engage in any other
work in the national economy. (*Id.*)

        Upon review of the entire record, the court
concludes that ALJ Grossman's decision is supported by

substantial evidence in the record.  While the court
acknowledges that the opinions of treating physicians are
typically afforded controlling weight, here, ALJ Grossman
appropriately declined to accord controlling weight to Dr.
Belyavsky's April 2009 opinion and provided "good reasons"
for so doing.

First, ALJ Grossman correctly considered the
supportability of Dr. Berlyavsky's April 2009 opinion.  *See*
20 C.F.R. § 404.1527(d)(3) ("The better an explanation a
source provides for an opinion, the more weight we will
give that opinion.")  Here, ALJ Grossman properly noted
that Dr. Belyavsky's April 2009 opinion that plaintiff had
marked functional limitations cited Dr. Belyavsky's mental
status examination findings recorded on March 10, 2009,
which showed plaintiff had good attention, good
intelligence, her insight and judgment were intact, she
related well, demonstrated normal speech, and possessed
rational goal-oriented thoughts.  (Tr. 587, 589, 596.)  The
court thus agrees with the ALJ's determination that Dr.
Belyavsky's April 2009 conclusion was not supported by
evidence to which she cited.

ALJ Grossman also correctly considered Dr.
Belyavsky's April 2009 opinion in light of the other
substantial evidence in the case record.  *Burgess*, 537 F.3d

at 128; 20 C.F.R. § 404.1527(d)(4) ("Generally, the more
consistent an opinion with the record as a whole, the more
weight we will give that opinion.").  The record reflects
that Dr. Belyavsky's April 2009 opinion is inconsistent
with her own notes from Ms. Mora's visits between May 2008
and March 2009, which consistently indicated that Ms. Mora
appeared alert, oriented, and well groomed, that her speech
was fluent, and that she consistently denied suicidal
ideation and hallucinations.  (*See, e.g.*, Tr. 605-616,
587.)  ALJ Grossman also properly considered that Dr.
Belyavsky's opinion was inconsistent with the opinions of
consultative examiners Dr. Dubro and Dr. Bornstein, and
State Agency psychologist Dr. Harding.  (Tr. 25; referring
to Tr. 457-61, 474-91, 702-07.)  On April 3, 2008, Dr.
Dubro concluded that Ms. Mora was capable of following,
understanding, and attending to simple directions and
instructions and was able to attend to a routine and
maintain a schedule.  (Tr. 460.)  On April 14, 2008, Dr.
Harding determined that plaintiff retained the functional
capacity for the basic mental demands of unskilled
competitive work.  (Tr. 476.)  On February 8, 2010, Dr.
Bornstein assessed, *inter alia*, that Ms. Mora could follow
and understand simple directions and perform simple tasks
independently and could maintain attention and a regular

schedule.  (Tr. 704.)  Given the substantial evidence on
the record contradicting Dr. Belyavsky's April 2009
opinion, the ALJ appropriately declined to give controlling
weight to her opinion.  *See, e.g.*, *Veino v. Barnhart*, 312
F.3d 578, 588 (2d Cir. 2002) (". . . [O]pinions of a
treating physician . . . need not be given controlling
weight where they are contradicted by other substantial
evidence on the record.") (internal citations omitted).

Plaintiff's reliance on the opinion of Dr.
Spiegel of FEGS from March 2008 is misplaced.  Dr.
Spiegel's conclusion that Ms. Mora was *temporarily* unable
to work (Tr. 439) is not entitled to any more weight than
the opinion of any other treating physician.  *Cf. Snell v.
Apfel*, 177 F.3d 128, 133 ("Some kinds of findings—including
the ultimate finding of whether a claimant is disabled and
cannot work—are 'reserved for the Commissioner'. . . . That
means that the Social Security Administration considers the
data that physicians provide, but draws its own conclusions
as to whether those data indicate disability.  A treating
physician's statement that the claimant is disabled cannot
itself be determinative.").  Based on the entire record,
and in particular the medical evidence discussed above, the
court finds that ALJ Grossman appropriately accorded little
weight to assessments of the FEGS examiners, including Dr.

48

Spiegel, because their opinions are inconsistent with other substantial evidence on the record. (Tr. 25.)

The court finds that the ALJ appropriately resolved the conflicting psychological evaluations of Ms. Mora's condition. Consequently, the court finds that the ALJ's application of the facts to the law to determine whether Ms. Mora was *per se* disabled at step three or had the requisite RFC to perform work in the national economy at step five is sound.

Specifically, to be found *per se* disabled under listing 12.04, the "required level of severity" is met when requirements in both A and B of Listing 12.04 are satisfied, or when requirements of C are satisfied. 20 C.F.R. Part 404, Subpart P, Appendix 1, Subsection 12.04. Here, the parties do not dispute that Ms. Mora had bipolar disorder under Subsection 12.04A. Subsection 12.04B requires at least two of the following: 1) marked restriction of activities of daily living; 2) marked difficulties in maintaining social functioning; 3) marked difficulties in maintaining concentration, persistence, or pace; or 4) repeated episodes of decompensation, each of extended duration. Plaintiff contends that pursuant to Dr. Belyavsky's April 2009 opinion, she has marked limitations

with respect to 12.04(B)(1), (2) and (3).  (Pl. Mem. at
20.)

　　　　As previously discussed, the court finds the ALJ
appropriately accorded little weight to Dr. Berlyavsky's
April 2009 opinion that plaintiff was "seriously limited"
and that ALJ Grossman's detailed decision identified and
discussed substantial evidence to support his findings that
Ms. Mora had a mild restriction with respect 12.04(B)(1)
(activities of daily living), and moderate restrictions
with respect to 12.04(B)(2) (social functioning) and
12.04(B)(3) (maintaining concentration, persistence or
pace).  (Tr. 16-17.)  The court also finds that substantial
evidence in the record supports the ALJ's determination
that Ms. Mora has the RFC to perform a full range of work
at all exertional levels with the following nonexertional
limitations: plaintiff can perform work limited to simple
tasks that requires only limited contact with the public
and does not require exposure to heights or dangerous
moving machinery.  (Tr. 18.)

## CONCLUSION

　　　　For the foregoing reasons, the court grants
Commissioner's motion for judgment on the pleadings and
denies plaintiff's cross-motion for remand of the case for
additional administrative proceedings.  The Clerk of Court

50

is respectfully requested to enter judgment in favor of

defendant and close the case.


**SO ORDERED.**

Dated:     July 9, 2015
           Brooklyn, New York


                              _____/s/_____
                              Kiyo A. Matsumoto
                              United States District Judge